## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JENNIFER LAMB,

        Plaintiff,                         Case No.

v.                                          Hon.

ZANETA ADAMS, individually, and
MICHIGAN DEPARTMENT OF
MILITARY AND VETERAN AFFAIRS,

        Defendants.

___

Noah S. Hurwitz (P74063)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St., STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com

___

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COME Plaintiff Jennifer Lamb, by and through her attorneys, HURWITZ LAW PLLC, and state the following:

### INTRODUCTION

1.      The Michigan Department of Military and Veterans Affairs ("DMVA") sustained significant, multilevel failures in its leadership during the past two years. In August 2021, Plaintiff Jennifer Lamb, a former United States Marines Corps officer and an experienced State Administrative Manager-15 ("SAM-15") within DMVA, bravely reported former Strategic Outreach Director Rob Price to Human Resources for his harassment of women. Mr. Price was subsequently investigated, Ms. Lamb's claims were substantiated, and Mr. Price was terminated. After months of performing Mr. Price's job duties, Ms. Lamb applied for Mr. Price's vacant

position, only to be denied the promotion after Director Zaneta Adams told Ms. Lamb that she was "looking for someone more diverse."  Director Adams would hire new Strategic Outreach Director Rebecca Flemming, who is objectively less qualified than Ms. Lamb.

2.       Ms. Lamb submitted a detailed complaint of race discrimination to Human Resources Director Noelle Rouse.  Just two weeks later, on June 8, 2022, Ms. Lamb was accused of "violations of Michigan Civil Service Commission Rules and/or DMVA Work Rules," suspended without due process, and escorted from the building.  Despite policy dictating that suspended employees have to be either returned to work or notified of the suspension reasons within seven days, Ms. Lamb's suspension dragged on for over three months without any explanation.  It was not until August 22, 2022 that Ms. Lamb was finally told that she had been suspended for "discriminatory harassment" and then paradoxically returned to work the next day.

3.       On September 21, 2022, Deputy Director Robert Near and Human Resources Director Noelle Rouse accused Ms. Lamb of "unprofessional words" during casual communications with colleagues—something nobody in DMVA has been disciplined for.  Mr. Near and Ms. Rouse stated that Ms. Lamb's use of the phrase "F this" was forbidden and Mr. Near stated that he never used a curse word in the workplace.  Mind you, Ms. Lamb did not actually say the word "Fuck," like when Governor Gretchen Whitmer said, "Shark Week, Motherfucker." Asked about saying "Motherfucker," Governor Whitmer explained, "[i]t's funny and it's about women's empowerment, and it makes me smile."  Ms. Lamb was disciplined for typing "F this" in an instant messaging conversation.

4.       Mr. Near and Ms. Rouse advised that, at the very least, Ms. Lamb could not be promoted for a minimum of two years and then threatened her with termination.  After so clearly being the target of whistleblower retaliation, Ms. Lamb resigned as a constructive discharge to

escape the Department's toxic work environment.  Strategic Outreach Director Flemming would be terminated for fraudulent behavior and Director Adams would be fired by the Governor, but not before the Department (a) failed to promote Ms. Lamb due to race discrimination; (b) conspired against Ms. Lamb to quell her free speech on matters of public concern; (c) unlawfully targeted Ms. Lamb for investigation; (d) suspended Ms. Lamb without justification; (e) disciplined Ms. Lamb for "poor language" that violated no formal departmental policy; and (f) forced her to resign.

## JURISDICTION AND PARTIES

5.      Plaintiff Lamb is an individual residing in Ann Arbor, Michigan.

6.      Defendant Zaneta Adams is the former Director of the Michigan Veterans Affairs Agency within the Michigan Department of Military and Veteran Affairs.

7.      Defendant Michigan Department of Military and Veterans Affairs is a state agency located in Lansing, Michigan.

8.      This action arises under the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981; Michigan's Elliot-Larsen Civil Rights Act (the "ELCRA"), M.C.L.A. § 37.1101, *et seq*, and the First Amendment of the United States Constitution.

9.      This Court has jurisdiction pursuant to 28 U.S.C.A. § 1331 (federal question jurisdiction) and 28 U.S.C.A. § 1343(a)(4) (jurisdiction over civil rights claims).  This Court also has supplemental jurisdiction pursuant to 28 U.S.C.A. § 1367 over Plaintiff's state law claim.

10.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the events giving rise to Plaintiff's claims took place.

11.     The facts and unlawful employment practices within the meaning of Title VII, Section 1981, the ELCRA, giving rise to this Complaint occurred within the Western District of

Michigan.

12.     Defendant is an employer and Plaintiff was its employee at all relevant times within the meaning of Title VII, Section 1981 and the ELCRA.

## **FACTUAL ALLEGATIONS**

13.     Plaintiff incorporates by reference herein the allegations contained in the foregoing paragraphs.

14.     Plaintiff is a Caucasian female.

15.     Plaintiff was most recently employed as a State Administrative Manager-15 (SAM-15) with the Michigan Veteran Affairs Agency, which is an agency within the Department of Military and Veterans Affairs.

16.     Plaintiff had no former discipline or performance issues as an employee of Defendant and served Defendant in exemplary fashion prior to engaging in protected activity.

17.     On or about August 11, 2021, Plaintiff sought advice from Deputy Director Robert Near regarding the hostile work environment that Strategic Outreach Director Rob Price created for women in the Department.

18.     Mr. Near told Plaintiff to "hang up the phone and call HR."

19.     Director Adams gave Plaintiff the same advice but to make sure she "cried" when she reported her complaints.

20.     Plaintiff was taken aback by this advice and felt like she was a pawn in a larger scheme by management to oust Mr. Price.

21.     In August 2021, Plaintiff reported Mr. Price to Human Resources in an attempt to ameliorate gender inequities in her workplace.

22.     Mr. Price was placed on administrative leave for four months.

23.     In December 2021, Director Adams informed Plaintiff that Mr. Price was being

relieved of his duties.

24.     In January 2022, Plaintiff's colleagues encouraged her to apply for the vacant position once held by Mr. Price, given her breadth of knowledge and experience, including the fact that she had been performing many of Mr. Price's job duties during his absence.

25.     Soon after, Plaintiff applied for the position and had her first interview on January 28, 2022.

26.     Plaintiff was interviewed for the job but denied a second interview.

27.     Plaintiff contacted Mr. Near on February 2, 2022 to express her concerns and receive feedback about her application.

28.     Mr. Near then merged Director Adams onto the call.

29.     Director Adams informed Plaintiff that she had been among the "top six [candidates]," but that they "were looking for someone more diverse."

30.     Plaintiff responded that she "could not change [her] race."

31.     Director Adams then quickly adjusted her reasoning, asserting that she was looking for "someone with VSO experience."

32.     A VSO is someone who attains a Veteran Service Officer accreditation by attending a five-day training and passing a short exam.

33.     The job description for the Strategic Outreach Director did not require VSO accreditation and neither of the two individuals who have been placed in this position since Ms. Lamb applied for this position were VSO accredited upon hire.

34.     Plaintiff has years of experience advocating for others and has two master's degrees, including one in directly relevant subject matter, and would have willingly received the accreditation.

35.     Upon information and belief, Defendant went on to interview only African American candidates as finalists for the position and hired an African American woman for the role.

36.     Defendant later hired Rebecca Flemming, an African American candidate who was not an accredited VSO at the time of her hire.

37.     Ms. Flemming would later be terminated by the DVMA for falsifying documents and misleading her superiors about her credentials to obtain employment.

38.     Plaintiff remained in her current position and continued to be an excellent supervisor of an effective team.

39.     Plaintiff required a medical leave of absence for a surgery on March 31, 2022 that required multiple follow-up medical appointments and a minimum of six weeks of recuperative time.

40.     On May 9, 2022, Plaintiff submitted a fitness-for-duty certification that complied with 29 CFR § 825.312.

41.     The medical documentation submitted contained the electronic signature of Dr. David Allan Marzano.

42.     On May 16, 2022, after she had already returned to work, Departmental Human Resources staff informed Ms. Lamb that they were refusing to accept Ms. Lamb's fitness for duty certification on specious grounds, claiming it did not comply with a policy.

43.     When Ms. Lamb objected to being subjected to an arbitrary, phantom criteria to return to work, Defendant's Human Resources, on Director Rouse's orders, threatened Ms. Lamb with termination, forced Ms. Lamb to leave work immediately, and then wrongfully disciplined her by placing an "absent without authorization letter" in her personnel file on May 17, 2022.

44. This letter unfairly held Plaintiff to standards that exceeded the regulatory framework of a fitness-for-duty certification under 29 CFR § 825.312 and constituted an adverse action in contravention of the Family Medical Leave Act ("FMLA").

45. On May 24, 2022, Plaintiff engaged in protected whistleblower activity when her legal counsel reported suspected legal violations to Defendant's Human Resources Director.

46. The May 24, 2022 letter apprised Defendant of its failure to comply with the FMLA.

47. The May 24, 2022 letter further apprised Defendant of Director Adams' racially discriminatory treatment toward her in relation to the Strategic Outreach Director position.

48. On June 8, 2022, just two weeks after receiving legal correspondence from Plaintiff's attorney, Defendant suspended Plaintiff for an "alleged violation of Michigan Civil Service Commission (MCSC) Rules and/or DMVA Work Rules.

49. On the day of her suspension, Plaintiff was specifically asked to come into the office on an "all staff" day only so that she could be escorted out of the building in front of the entire agency.

50. Plaintiff's suspension took place immediately before the Women Veteran Conference, a conference Plaintiff helped plan and was scheduled to moderate.

51. In a memorandum dated June 16, 2022, Mr. Near stated that Plaintiff was his recommendation for the hired position as the SAM-15.  This letter was submitted nearly 60 weeks after Plaintiff had been placed in this position with no explanation for the lateness of this letter.

52. This memorandum was only submitted after Plaintiff engaged in protected activity.

53. Mr. Near spoke very positively about Plaintiff's experience and aptitude, stating, in pertinent part:

Mrs. Lamb has an extensive background in the veteran space, she [sic] current focus is the research, design, outreach and implementation of counseling services for military veteran populations who do not have similar services available through the Department of Veteran Affairs. She has managed two veteran centric programs which included finding novel outreach approaches to identify individuals who could benefit from services available for service members, veterans, and their families. She has also managing [sic] programs that find and connect military spouses who are seeking ways to become more resilient and to build communities of support and providing outreach at a national level to both find participants for programing and to enhance our program's national reputation. Many of these individuals are not struggling to meet social determinants of help and are not seeking services but could benefit from being connected with other veterans. She is an experienced veteran advocate and manager who has a great knowledge base regarding strategy. She has twenty years of management and leadership experience. She currently manages a staff of research therapists and administrative and support personnel with an internal working budget of $4.8M and full reporting to Grant Services & Analysis and to our funding sources. She also manages contract mental health agencies across the state to provide M-SPANs model of resiliency support. She has trained, supervised, and coached mental health therapists across the state and work with individuals with multiple licenses to include LPCs, LMFTs. She has experience supervising both fully licensed and limited licensed social workers. She has strong relationship with statewide veteran navigators, with Veteran Community Action Teams (VCATs) and with Family Assistance Coordinators (FACs) across the state. She also currently serves on the MVAA's statewide appointed board and work with state and national leaders to improve services for women veterans.

54.     On August 22, 2022, Defendant's Human Resources informed Plaintiff that she could return to work effective immediately.  During this call, Defendant notified Plaintiff that her suspension was for a "discriminatory harassment" complaint but that the allegations were "unsubstantiated."

55.     On August 23, 2022, Plaintiff emailed the Adjutant General of Michigan, GEN Paul Rogers, to report retaliation by her superiors.

56.     . She stated, in pertinent part:

The last several weeks have been a living hell. The Agency suspended me in June to investigate my claim of workplace discrimination–a retaliatory act designed to have a chilling effect on whistleblowers like me. I reported Director Zaneta Adams of discrimination (after she told me and Robert Near that she was looking for someone with "more diversity" to fill a position), yet I was the one suspended–not her. I was then told there was never any justification for my suspension, but that I need to return to work with the same managers who discriminated against me as well as the person who they hired. No reasonable person in my position would return to work under these circumstances and it would be intolerable for me to do so absent (i) a clear explanation why I was suspended; (ii) a report on the status of any investigation into the discriminatory actions I reported in June; and (iii) some sort of change in the leadership that has created this concern…

I was passed over for promotion in favor of a lesser qualified candidate (Rebecca Flemming). Among the numerous integrity concerns I have about her include her background inconsistencies to include that her now deleted Linked-In profile and the internet information available on her (the only information we had to find out who she was since her only information to anyone was "read my bio") has alleged since 2016 that she had a PhD in Adult Education. She now alleges that she completed a PhD in 2022 in a different field. The irony is that while I was required to submit all of my official transcripts before I could even be considered for an interview, Ms. Flemming was apparently hired without any vetting.

I was escorted out of the building in front of the whole agency as if I had committed a crime. Even Ms. Flemming's predecessor, who was terminated for gender discrimination, was afforded the dignity of leaving the premises on his own accord. I now understand that while I was suspended for months, human resources interviewed most of the agency about me–asking my colleagues and all of my direct reports whether I ever stated that hiring Rebecca Flemming was a "diversity hire"–proof that my suspension related to reporting discrimination.

Even though I was told to return to work just now and informed by human resources that there was no evidence I did anything wrong, human resources also cautioned me, "just because we're bringing you back to work, doesn't mean that discipline may not occur." For weeks I have been treated like a villain. I have never received information on why I was suspended. I had zero communication from my leadership or Human Resources since I was escorted off the base. I have been ostracized for reporting the discriminatory

comments uttered by Director Adams. During that time, three members of my team voluntarily left the Department. I have suffered severe emotional distress, having never believed until now that a public servant could be treated this way. My character has been attacked and my reputation ruined. I can only assume what the future would hold upon my return – but I have all reason to believe that returning to work under the present circumstances with nobody to protect me will lead to further pain, humiliation, and terrible distress.

57.     Plaintiff did not receive a response from GEN Rogers.

58.     Instead, on August 24, 2022, Emily Gossman, a Human Resources Specialist of Defendant, replied to the contents of the email.

59.     Ms. Gossman began her response by arguing that she never told Plaintiff that there "was no evidence [she] did anything wrong," but rather that Defendant "did not find evidence to substantiate the initial allegation of discriminatory harassment."

60.     Then, Ms. Gossman asserted that she had informed Plaintiff that the investigation was not finalized, and that disciplinary action may occur, but that said disciplinary action would not raise to the level of termination.

61.     Ms. Gossman aimed to address the contents of Plaintiff's email to GEN Rogers, stating:

> *Clear explanation why I was suspended* – as discussed yesterday, you were placed on paid administrative leave (this is not a disciplinary suspension) based on an initial allegation of discriminatory harassment we received in May 2022 and alleged behavior unbecoming a SOM employee stemming from an incident in June 2022. As I stated previously, the allegation into discriminatory harassment was inconclusive. As such, you are permitted to return to work at this time, as I explained yesterday and clarified above. The investigation is still ongoing and may result in disciplinary action if you are found to have violated DMVA work rules or CSC Rules and/or Regulations.  However, we have enough information at this point to determine that no dismissible work rules have been substantiated.

> *A report on the status of any investigation into the discriminatory actions I reported in* June – As I stated yesterday, this investigation is still pending.  However, I expect it to be concluded in the very near future.  In accordance with Civil Service Regulation 1.03, "after the investigation, the appointing authority shall advise the person making the report and the alleged harasser whether the investigation substantiated the report, did not substantiate the report, or was inconclusive."

> *Some sort of change in the leadership that has created this concern* – to alleviate your concern about the leadership within the MVAA, we have determined that you will be reporting to Deputy Director, Robert Near, until the conclusion of the investigation regarding your complaint.  Based on the original letter from your attorney we received in May 2022, you stated that your concern was with Director Zaneta Adams, and so we have made efforts to mitigate direct contact with Director Adams until the conclusion of the investigation noted above.

62.     Despite Defendant's mistreatment of Plaintiff since she engaged in protected activity, Ms. Gossman closed this email by stating that "the Department is in no way attempting to have [her] relinquish [her] job," and that she was a valued member of Defendant.

63.     On September 7, 2022, Ms. Gossman emailed Plaintiff to inform her that her complaint had "been thoroughly investigated and a determination has been made that there [was] not sufficient evidence to support the allegation(s)," and that the investigation had been closed. Plaintiff did not receive information as to the nature of the complaint or who made the complaint.

64.     On September 12, 2022, Ms. Gossman emailed Plaintiff to inform her that her performance was "unsatisfactory," and that she was required to attend a disciplinary conference.

65.     In this email, Ms. Gossman included Plaintiff's Interim Employee Rating. It described Plaintiff's alleged "performance issues," which included the following:

> "5/20/2022 – Verbal Counseling to address use of the phrase "f this" in a chat with subordinate employees, and an allegation that you had hung up on the Disability Management Office (DMO) on 05/10/2022…

11

> May to June 2022: Several inappropriate comments, chats, and communications with subordinates and/or other members of the Department, to include disparaging and unprofessional language using SOM email, test, and/or Teams messages…
>
> May 10, 2022: During [Plaintiff's] verbal counseling, [she] misrepresented a conversation [she] had with the DMO to [her] supervisor…"

66.     This email included a packet with several attachments of innocuous comments Plaintiff made from the date she engaged in protected activity to the present.

67.     The first attachment was a transcript of a conversation Plaintiff had with the Disability Management Office regarding her protected leave paperwork.

68.     The Office reached out to inform Plaintiff that she needed to resubmit her FMLA time off request paperwork a third time, as the signature was not labeled as electronically signed.

69.     Plaintiff informed the agent that she needed to call her physician, then ended the conversation.

70.     The second attachment was a text Plaintiff sent to Ryan Sanderson, one of Plaintiff's contracted employees, which stated that "Our Comms manager is an idiot."

71.     This screenshot did not include context. In this matter, Plaintiff was consoling Mr. Sanderson  about an error the Communications Manager (also a SAM-15) made which impacted Plaintiff's peer's work. This text message was sent privately to Mr. Sanderson in an effort to provide emotional support to Ms. Lamb's direct report.

72.     The third attachment was a screenshot of a Microsoft Teams message that Plaintiff sent to Meghan Ford, a Human Relations technician, stating "if there's something in my HR permanent file about me yelling at disability management services and hanging up the phone on them, just know that it's true and let's move on [unreadable emoji]."

73.     Again, the message was taken out of context. Plaintiff included a laughing/crying

emoji, which changes the tone of the message. Ms. Ford was expressing her relief that Ms. Lamb was back to work and Ms. Lamb playfully communicated her frustration about the accusations she was facing to by making a joke regarding the circumstances.

74.     The fourth attachment was another Teams message Plaintiff sent to Mr. Near, Ms. Flemming and her direct reports upon being told she was being suspended from work until she could get a non-electric signature on her FMLA paperwork to return to work, in which she stated, "F this is all I have to say."

75.     Again, Defendant did not include context. Soon after Plaintiff sent this Teams message, she sent apologies to each person in the chat, stating, "Let me apologize for my outburst above. It wasn't very professional of me and surely wasn't becoming of how I represent the agency. I let my frustration get the best of me and for that I apologize. This will surely blow over and I will eventually be allowed to return to work…"

76.     Several individuals "hearted" the message, and one person said, "no worries."

77.     No one reached out to Plaintiff regarding this message until she received the attachment from Ms. Gossman.

78.     The fifth attachment was a screenshot of a Teams message that Plaintiff sent to Mr. Near stating "oh just fire me already [unreadable emoji]

79.     This screenshot did not include context. This message was sent on May 16˙2022, before Ms. Lamb was sent home "absent without authorization" for her FMLA claim in reference to the overwhelming amount of work that Plaintiff found upon her return from leave, and Mr. Near replied with a laughing emoji.

80.     Other attachments included screenshots of two Teams messages that Plaintiff sent to people "outside her chain of command," who were new hires of the Department.   These

messages simply welcomed new staff members with helpful tips about the agency and was in keeping with the agency's "on-boarding" process of which all new employees were required to meet with key personnel—including Plaintiff—upon being hired

81.     Prior to receiving this attachment, Plaintiff has never been told that she could not communicate with anyone at the Agency outside of her chain of command.

82.     On September 21, 2022, Defendant held a Disciplinary Conference for Plaintiff.

83.     During this Disciplinary Conference, Plaintiff was counseled by Ms. Rouse regarding purported unprofessionalism during conversations with the same benefit specialists who were wrongly challenging her FMLA paperwork.

84.     Ms. Rouse told Plaintiff that she had been advising Disability Management Offices on denying Ms. Lamb's return to work as a punishment for Ms. Lamb "hanging up the phone on the Office."

85.     Ms. Rouse accused Plaintiff of using "poor language," citing the "F this" Teams Chat.

86.     Defendant does not have a policy forbidding the use, or suggested use, of swear words.

87.     The words Plaintiff was accused of saying were "ass," "f this," "idiot," "damnit," "you all are crazy," and "wishy-washy."

88.     During the Conference, Mr. Near indicated that he did not believe that he has ever used any curse words in communications.

89.     Additionally, Ms. Rouse was asked about Governor Whitmer using curse words, but Ms. Rouse refused to distinguish between the Governor's curse words and Plaintiff's communications.

90.     On September 26, 2022, Plaintiff submitted a constructive discharge email to her

superiors.

91.     Plaintiff's email stated the following:

> I reported discriminatory acts leading to Director Adams failing to consider me for the Strategic Outreach Director position based on her "looking for someone who brought more diversity." She would go on to hire an outside candidate who was less qualified than I am and then to remove me from her senior leadership and from key aspects of my job based on the hire she made.

> I sought assistance upon returning from my medical leave that resulted in an "absent without authorization" letter being placed in my personnel file after being sent home by my leadership.

> However, instead of the Agency investigating any of my concerns, I learned at a disciplinary hearing last week with Deputy Director Near and lead [sic] by Noelle Rouse that the Agency and the Department launched an unprecedented investigation into me, suspended me without justification, reviewed all of my work communications (i.e. emails, messages, text messages) and flagged what can only be described as innocuous messages that happened to have PG swear words in them, or communication to internal staff members, and took disciplinary action against me for reasons having nothing to do with my performance.

> The "poor language" used in my messages has never, to my knowledge, been a reason to discipline anyone in the department. In addition, nobody from the department has had their messages searched for the specific reason of manufacturing a disciplinary action. During the disciplinary hearing, Deputy Director Near claimed that he did not think he has ever used a curse word in all his communications and did not mention the derogatory statements that he has made about others at the agency. HR Director Rouse claimed such words and statements are forbidden — these statements are false, and these omissions are glaring.

> I therefore realized that I am being singled out for my complaints and being retaliated against as the target of an unlawful witch hunt. I now have a disciplinary record with the Department after being a stellar employee since I was hired and I am ineligible for promotion to the once again vacant Strategic Outreach Director position, a position for which I am immensely qualified for, or any position with the agency based on regulations specific for negotiated state

employees that do not apply to me.

The Department has therefore conspired against me to quell my free speech on matters of a public concern, unlawfully targeted me for investigation, punished me for language that violates no formal policy, suspended me without justification, and disciplined me for conduct that nobody in the Department has been disciplined for.

I believe that anyone in my position would feel compelled to resign. I have presented verified complaints again and again to the Department, but instead of investigating my complaints, the wrongdoers attack me.

Because I have been repeatedly retaliated against and wrongfully disciplined in an effort to discredit me, I have no choice but to leave my position and try to expose this unlawful behavior from outside the agency. My last day working for the Department is today.

92.     Plaintiff filed a timely charge of discrimination with the EEOC alleging discrimination on October 14, 2022.

93.     Plaintiff's charges were filed within 300 days of the unlawful employment practices alleged in this claim.

94.     Director Adams was removed from her position effective January 1, 2023, as announced by the Governor on December 2, 2022.

## COUNT I
## VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq*.
## <u>DISCRIMINATION AGAINST ALL DEFENDANTS</u>

95.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

96.     At all relevant times, Defendant was an employer with greater than 15 employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b).

97.     Plaintiff is a member of a protected class based on her race (white).

98.     Defendant's actions were motivated by unlawful discrimination against Plaintiff because of her race.

99.     Defendant subjected Plaintiff to adverse employment actions, including constructive discharge, based on her race.

100.    Plaintiff would not have been constructively discharged but for the fact that she was white.

101.    Plaintiff would have been promoted or at a minimum, kept her job had she been a different race and all other facts had remained the same.

102.    Defendant's actions were taken in reckless disregard of Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

103.    As a direct and proximate result of Defendant's actions, Plaintiff has been damaged and will so suffer in the future.

## COUNT II
### VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq*.
### RETALIATION AGAINST ALL DEFENDANTS

104.    Plaintiff restates the foregoing paragraphs as set forth fully herein.

105.    It is unlawful for an employer to retaliate against employees who communicate about employment discrimination.

106.    Plaintiff engaged in protected activity when she reported racial discrimination to her supervisors.

107.    Defendant subsequently retaliated against Plaintiff by suspending her without justification and forcing her to resign.

108.    Plaintiff suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith because

of the unlawful retaliatory conduct, and she will continue to suffer in the future.

**COUNT III**
**DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**
**AGAINST ALL DEFENDANTS**

109.    Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

110.    Plaintiff is white.

111.    During Plaintiff's employment with Defendant, Defendant violated Plaintiff's rights by depriving her of her right to the enjoyment of all benefits, privileges, terms and conditions of employment in violation of 42 U.S.C. § 1981(b), as amended.

112.    Plaintiff was treated differently, discriminated against, and eventually constructively discharged because of her race, in whole or in part.

113.    During her employment, Plaintiff has not enjoyed the same benefits, privileges, terms and conditions of employment as have non-white employees in regards to being suspended for engaging in protected activity.

114.    Defendant's treatment, practices and policies directed toward Plaintiff, as more fully described in this complaint, denied Plaintiff the full and equal benefits of all laws and proceedings for the security of persons and property as enjoyed by other citizens in violation of 42 U.S.C. § 1981, as amended.

115.    Through Defendant's actions and constructive discharge of Plaintiff, there is ample evidence that Defendant intended to discriminate against Plaintiff on the basis of her race.

**COUNT IV**
**ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2010 et seq.**
**DISCRIMINATION AGAINST ALL DEFENDANTS**

116.    Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

117.    Defendant employed Plaintiff within the meaning of the Elliott-Larsen Civil Rights

Act, MCL 37.2010 et seq. ("ELCRA").

118.    Defendant is an employer within the meaning of the ELCRA.

119.    The ELCRA prohibits, among other things, discrimination based upon race.

120.    Plaintiff is white.

121.    Plaintiff was qualified for her position.

122.    Plaintiff was held to different standards than her non-white coworkers based on her race.

123.    Plaintiff suffered adverse actions, including suspension and constructive discharge.

124.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff was harmed, and continue to be harmed, in that she has suffered economic and non-economic loss, including but not limited to: lost wages, damages to professional reputation, emotional distress, outrage, humiliation, indignity and disappointment.

**COUNT V**
**42 USC § 1983**
**FIRST AMENDMENT RETALIATION**
<u>**AGAINST DEFENDANT ADAMS IN HER PERSONAL CAPACITY**</u>

125.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

126.    The First Amendment of the United States Constitution, as incorporated into the 14th Amendment, prevents governments from abridging an individual's freedom of speech.

127.    The freedom of speech is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415, 99 S. Ct. 693, 697, 58 L. Ed. 2d 619 (1979).

128.    The First Amendment protects an individual from retaliation when she has

exercised her freedom of speech.

129.    The rationale for protecting a public employee's right to comment on matters of public concern is that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004).

130.    An employee speaking as a citizen is speaking on a matter of public concern when that speech can be fairly considered as relating to any matter of political, social, or other concern to the community. Another consideration is whether the speech involves a subject of general interest and of value and concern to the public. *Mosholder v. Barnhardt*, 679 F.3d 443, 449 (6th Cir. 2012).

131.    Speech entails a matter of public concern when the speech involves issues for which information is needed to enable members of society to make informed decisions regarding their government's operation. *Banks v. Wolfe Co. Bd. of Ed.*, 330 F.3d 888, 892 (6th Cir. 2003).

132.    "Public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *Id.* at 83-84.

133.    "When a public employee speaks on a matter that is merely related to the employee's profession, he or she is a member of the community most likely to have an informed and definite opinion and must be permitted to speak freely absent fear of retaliation*." Garvin v. Detroit Bd. of Educ.*, No. 298838, 2013 WL 951118, at *11 (Mich. Ct. App. Feb. 26, 2013), citing *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

134.    Plaintiff's speech regarding her supervisor's sexual harassment of women and

Director Adams' discrimination of Plaintiff on the basis of race was not made pursuant to her official duties.

135.    "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986).

136.    Plaintiff's speech was made as a citizen on a matter of public concern.

137.    Bringing to light potential or actual wrongdoings or a breach of the public trust are generally matters of public concern. *Connick v. Myers*, 461 U.S. 138, 148, 103 S.Ct. 1684, 1691, 75 L. Ed. 2d 708 (1983). Moreover, "discipline and morale in the workplace are related to an agency's efficient performance of its duties[.]" *Id*.

138.    Defendant punished Plaintiff for raising matters of public concern.

139.    Defendant permitted Plaintiff's termination for speaking out about how the Department engaged in unlawful racial discrimination.

140.    Plaintiff's termination was motivated, at least in part, by the exercise of her First Amendment Right to free speech.

141.    Plaintiff's interest as a citizen in speaking on these matters was significant, as they concerned substantial matters of ethics and public safety that she was well informed and entitled to make.

142.    Defendant made false accusations against Plaintiff as a measure of punishment.

143.    Defendant acted with deliberate indifference to Plaintiff's presumed and actual innocence.

144.    Defendant agreed to, approved, and ratified this unconstitutional conduct.

145.    It would have been plainly obvious to a reasonable official that such actions or inaction would deprive or lead to the deprivation of Plaintiff's constitutional rights.

146.     Defendant's actions and inaction, as set forth above, were fundamentally unfair to Plaintiff.

147.     As a direct and proximate results of Defendant's retaliation, Plaintiff has suffered emotional and physical distress, feelings of depression, mental and physical anguish, loss of reputation, humiliation, and embarrassment and the physical effects associated therewith, and will so suffer in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

A.     Judgment against Defendant in the amount of Plaintiff's unpaid back pay, front pay, injunctive relief, declaratory judgment, liquidated damages, punitive damages, and attorney fees under Title VII, Section 1981, ELCRA and the First Amendment.

B.     Award Plaintiff's appropriate equitable relief, compensatory damages, and exemplary damages;

C.     Appropriate civil penalties;

D.     All costs, attorneys' fees, and interest incurred prosecuting this claim; and

E.     All further relief as the Court deems just and equitable.

Respectfully submitted
HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Attorney for Plaintiff

Dated:  July 26, 2023

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER LAMB,

   Plaintiff,        Case No.

v.                 Hon.

ZANETA ADAMS, individually, and
MICHIGAN DEPARTMENT OF
MILITARY AND VETERAN AFFAIRS,

   Defendants.

_____

Noah S. Hurwitz (P74063)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
_____

## JURY DEMAND

   NOW COMES Plaintiff Jennifer Lamb, by and through her attorneys, HURWITZ LAW

PLLC, and hereby demand a trial by jury of the issues in the above-captioned cause of action.

         Respectfully submitted
         HURWITZ LAW PLLC

         */s/ Noah S. Hurwitz*
         Noah S. Hurwitz (P74063)
Dated:  July 26, 2023    Attorney for Plaintiff